# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHUMASH CAPITAL INVESTMENTS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. N23C-07-209 SKR CCLD |
| | ) | |
| GRAND MESA PARTNERS, LLC f/k/a CAPCO GROWTH PARTNERS, LLC, ERIC WEISSMANN, CGP HOLDINGS, LLC, D. CHRISTIAN OSBORN, OSBORN GENERATION FUND, LLC, CORDELL BENNIGSON, DIANA THOMAS, STEPHEN K. WOOD, SIERRA PAPA, INC., DAVID A. GEZON, MIDWEST MEZZANINE FUND V SBIC, L.P., FUND V BLOCKER CORP., FUND V INTERMEDIATE, LLC, STEVEN R. WILKINS, and TRUE WEST CAPITAL PARTNERS FUND II, LP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: February 22, 2024
Decided: April 10, 2024

*Upon Defendants' Motion to Dismiss*:

**GRANTED in part, DENIED in part.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Kevin R. Shannon, Esquire, Christopher N. Kelly, Esquire, Justin T. Hymes, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, William C. O'Neil, Esquire, Jeffrey J. Huelskamp, Esquire, Gretchen Scavo, Esquire, Winston & Strawn LLP, Chicago, Illinois, Marisa E. Witter, Esquire, Winston & Strawn LLP, Houston, Texas *Attorneys for Plaintiff*.

Rudolf Koch, Esquire, Travis S. Hunter, Esquire, Alexander M. Krischik, Esquire, Elizabeth J. Freud, Esquire, Griffin A. Schoenbaum, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, *Attorneys for Defendants Grand Mesa Partners, LLC f/k/a Capco Growth Partners, LLC, Eric Weissmann, CGP Holdings, LLC, Osborn Generation Fund LLC, D. Christian Osborn, Cordell Bennigson, Diana Thomas, Stephen K. Wood, and Sierra Papa, Inc*.

James G. Sawtelle, Esquire, Sherman & Howard L.L.C., Denver, Colorado, *Attorney for Defendants Cordell Bennigson and Diana Thomas*.

R. Montgomery Donaldson, Esquire, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware, B. John Casey, Esquire, Ryan H. Tamm, Esquire, Stoel Rives LLP, Portland, Oregon, *Attorneys for Defendants David A. Gezon, Midwest Mezzanine Fund V SBIC, L.P., Steven R. Wilkins, True West Capital Partners Fund II, LP, Fund V SBIC Blocker Corp., and Fund V Intermediate, LLC*.

**RENNIE, J.**

# I. INTRODUCTION

This controversy arises from a purportedly fraudulent equity purchase agreement (the "Purchase Agreement"). Plaintiff, the buyer in the transaction, claims that several of the contractual representations made by the seller were knowingly false. Beyond seeking to hold the seller liable, Plaintiff has asserted claims against some of the seller's managers and owners. Plaintiff's Complaint brings two Counts. Count I alleges fraud against the seller and certain individuals who helped to negotiate the Purchase Agreement. Count II alleges unjust enrichment against each of the Defendants. Defendants responded with this Motion to Dismiss. The Motion is largely successful.

Plaintiff's primary obstacle is that this Court lacks personal jurisdiction over most of the Defendants. Only four of the fifteen Defendants are at home in Delaware. For the rest, Plaintiff relies on the Purchase Agreement's forum selection clause to establish their consent to Delaware's jurisdiction. But only the seller expressly assented to that clause. Plaintiff says the other non-Delaware Defendants should be bound to the forum selection clause by the doctrine of equitable estoppel. Contrary to Plaintiff's argument, and as explained more fully below, neither receiving distributions related to a transaction nor participating in the negotiation of a transaction is enough to bind an entity's members to transaction documents signed only by the entity. For that reason, the ten Defendants who are not at home in

1

Delaware and did not sign the Purchase Agreement are outside this Court's jurisdiction, so the claims against them must be dismissed.

While the personal jurisdiction analysis narrows this dispute, it does not end it. To finish the job, Defendants claim that Plaintiff's claims are untimely because they were filed outside of the survival period that applies to the challenged representations. This argument implicates an unsettled corner of Delaware law: the extent to which a party can contractually relieve itself of fraud liability by reducing the time the counterparty has to bring fraud claims. That question, though, need not be decided here. Rather, based on ordinary principles of contract interpretation, the Court finds that by excepting fraud claims from the indemnity provisions that contain the survival clause, the Purchase Agreement did not limit fraud claims to the survival period. Thus, Plaintiff's claims will not be dismissed as untimely.

Turning to the merits, Defendants urge that Plaintiff's fraud allegations are insufficiently pled. This argument is unpersuasive. Defendants only succeed in raising factual disputes that do not warrant dismissing Plaintiff's fraud claim. In their arguments, Defendants treat Superior Court Civil Rule 9(b) as if it requires a plaintiff to practically prove their fraud claim at the pleading stage. Rule 9(b) is not so burdensome. The circumstances that fall under Rule 9(b)'s ambit are discrete and simple to establish in the context of contractual fraud. So, while the seller is the only

Defendant that can be made to litigate Count I in this jurisdiction, the claim can nevertheless go forward.

Defendants' final barrage pertains to Plaintiff's unjust enrichment Count. While the unjust enrichment claim is not entirely deficient or barred by the Purchase Agreement as Defendants contend, Defendants are correct that this claim can only persist against Defendants who are alleged to have played a role in the fraud. In brief, with regard to the Defendants who are not alleged to have knowingly facilitated misconduct, the relationship between their enrichment and Plaintiff's impoverishment is insufficient to support an unjust enrichment claim. Since Plaintiff does not allege that the four Defendants who are at home in Delaware engaged in the alleged fraud, the unjust enrichment claim only survives as to the seller.

For those reasons and the reasons stated below, only Plaintiff's claims against the seller itself are viable. Therefore, Defendants' Motion is **GRANTED in part, DENIED in part.**

## II. BACKGROUND[1]

### A. The Parties

Plaintiff Chumash Capital Investments, LLC ("Plaintiff") is a Delaware entity headquartered in California.[2] Plaintiff was the buyer of non-party Capco, LLC (the "Company") in the now-disputed transaction.[3]

Defendant Grand Mesa Partners, LLC f/k/a Capco Growth Partners, LLC ("Seller") is a Colorado entity headquartered in that state.[4] Seller wholly owned the Company before selling it to Plaintiff.[5]

Defendant Eric Weissmann is a Florida resident.[6] At the relevant times, Weissmann was a manager and the treasurer of Seller, as well as a vice president of the Company.[7] He was also the manager of Defendant CGP Holdings, LLC.[8]

---

[1] The following facts are derived from the well-pleaded allegations in the Complaint and the documents incorporated therein. *See* D.I. No. 1 ("Compl."). These facts are presumed to be true solely for purposes of this opinion.

[2] Compl. ¶ 8.

[3] *Id.* ¶ 2.

[4] *Id.* ¶ 9.

[5] *Id.*

[6] *Id.* ¶ 10.

[7] *Id.*

[8] *Id.* ¶ 11.

Defendant CGP Holdings, LLC ("CGP Holdings") is a Colorado entity headquartered in that state.[9] At the relevant times, CGP Holdings held a 26.03% ownership interest in Seller.[10]

Defendant D. Christian Osborn is a Colorado resident.[11] At the relevant times, Osborn was the chairman of Seller's Board of Managers.[12] Osborn was also a vice president and the treasurer of the Company.[13] He was also the manager of Defendant Osborn Generation Fund, LLC.[14]

Defendant Osborn Generation Fund, LLC ("Osborn Generation Fund") is a Colorado entity headquartered in that state.[15] At the relevant times, Osborn Generation Fund held a 4.71% ownership interest in Seller.[16]

---

[9] *Id.*

[10] *Id.*

[11] *Id.* ¶ 12.

[12] *Id.*

[13] *Id.*

[14] *Id.* ¶ 13.

[15] *Id.*

[16] *Id.*

Defendant Cordell Bennigson is a Texas resident.[17] He was the Company's chief executive officer.[18] At the relevant times, Bennigson held a 1.56% ownership interest in Seller and was on Seller's Board of Managers.[19]

Defendant Diana Thomas is a Colorado resident.[20] She was a member of Seller and the Company's chief financial officer.[21] Thomas also became the Company's secretary.[22]

Defendant Stephen K. Wood is a Colorado resident.[23] He was on Seller's Board of Managers.[24] Wood was the president of Defendant Sierra Papa, Inc.[25]

Defendant Sierra Papa, Inc. ("Sierra Papa") is a Colorado entity headquartered in that state.[26] At the relevant times, it held an 18.69% ownership interest in Seller.[27]

---

[17] *Id.* ¶ 14.

[18] *Id.*

[19] *Id.*

[20] *Id.* ¶ 15.

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 16.

[24] *Id.*

[25] *Id.* ¶ 17.

[26] *Id.*

[27] *Id.*

Defendant David A. Gezon is a resident of Illinois.[28] He was one of Seller's managers.[29] Gezon also controlled three other Defendants in this action: Midwest Mezzanine Fund V SBIC, L.P.; Fund V SBIC Blocker Corp.; and Fund V Intermediate LLC (together, the "Midwest Funds").[30]

Defendant Midwest Mezzanine Fund V SBIC, L.P. ("Midwest Mezzanine") is a Delaware entity headquartered in Illinois.[31] At the relevant times, it held a 15.08% ownership interest in Seller.[32]

Defendant Fund V SBIC Blocker Corp. ("Fund V Blocker") is a Delaware entity headquartered in Illinois.[33] At the relevant times, it held a 1.63% ownership interest in Seller.[34]

Defendant Fund V Intermediate LLC ("Fund V Intermediate") is a Delaware entity headquartered in Illinois.[35] At the relevant times, it held a 4.32% ownership interest in Seller.[36]

---

[28] *Id.* ¶ 18.

[29] *Id.*

[30] *Id.* ¶¶ 19-21.

[31] *Id.* ¶ 19.

[32] *Id.*

[33] *Id.* ¶ 20.

[34] *Id.*

[35] *Id.* ¶ 21.

[36] *Id.*

Defendant Steven R. Wilkins is an Oregon resident.[37] He was on Seller's Board of Managers.[38] Wilkins was a member of Defendant True West Capital Partners Fund II, LP.[39]

Defendant True West Capital Partners Fund II, LP ("True West") is a Delaware entity headquartered in Oregon.[40] At the relevant times, it held a 13.31% ownership interest in Seller.[41]

## B. The Disputed Sale

### 1. The Parties' Negotiations

In April 2021, Plaintiff sent Seller a letter of intent outlining its interest in purchasing the Company.[42] Plaintiff's proposed purchase price was based upon the Company's 2020 EBITDA of $11 million.[43] Seller responded that, as of April 2021, the Company's trailing twelve-month ("TTM") EBITDA was $12.75 million.[44] Seller counteroffered in May 2021 with a price based on the $12.75 million EBITDA calculation.[45]

---

[37] *Id.* ¶ 22.

[38] *Id.*

[39] *Id.* ¶ 23.

[40] *Id.*

[41] *Id.*

[42] *Id.* ¶ 47.

[43] *Id.*

[44] *Id.* ¶ 48.

[45] *Id.* ¶ 49.

Relying on the $12.75 million figure, the parties compromised for a purchase price of $88 million for the Company.[46] In doing so, they agreed to use the TTM EBITDA suggested by Seller but applied a lower multiplier than Plaintiff had initially used.[47]

## 2. The Purchase Agreement

Representatives from Plaintiff, Seller, and the Company signed the Purchase Agreement on July 2, 2021.[48] They agreed that Delaware law would apply to any disputes related to the Purchase Agreement.[49] The Purchase Agreement similarly provided that any litigation related to the Purchase Agreement would be brought in Delaware and that the parties to the Purchase Agreement would submit to the jurisdiction of the Delaware courts.[50]

In the Purchase Agreement, Seller made several representations that are challenged by Plaintiff's Complaint. Specifically, Section 3.4(a) of the Purchase Agreement represented: "True, complete and correct copies of the Financial Statements are attached to Schedule 3.4(a)."[51]

---

[46] *Id.* ¶ 50.

[47] *Id.* Plaintiff had initially proposed multiplying the 2020 EBITDA by 7.5 for a total of $82.5 million, but ultimately multiplied the TTM EBITDA by 6.9. *Id.* ¶¶ 49, 50.

[48] *Id.* ¶ 50. *See generally* Compl., Ex. A (hereinafter "Purchase Agreement").

[49] Purchase Agreement § 11.13.

[50] *Id.* § 11.2.

[51] *Id.* § 3.4(a).

9

Section 3.4(b) represented in part: "Each of the Financial Statements presents fairly, in all material respects, the consolidated financial position of the Company for the periods then ended, as applicable, in accordance with GAAP," with certain limited exceptions.[52]

Section 3.4(b) continued:

> The Company maintains a system of internal accounting controls that is designed to provide reasonable assurance that: (i) transactions are recorded as necessary to permit materially correct preparation of its financial statements and to maintain reasonably accurate accountability for its assets; (ii) the reporting of its assets is compared with existing assets at regular intervals; and (iii) accounts, notes and other receivables and inventory are recorded in accordance with GAAP.[53]

Section 3.4(b) concluded: "During the past three (3) years, to the Seller's Knowledge, there has not existed any material weakness or significant deficiency in the accounting or auditing practices, procedures, methodologies or methods of the Company or its internal accounting controls."

Next, Section 3.10(b)(ii)(E) represented:

> In the last six (6) years . . . [t]he Company has maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, as applicable, that are in material compliance with all applicable requirements of the Current Government Contracts and of applicable Laws.[54]

---

[52] *Id.* § 3.4(b).

[53] *Id.*

[54] *Id.* § 3.10(b)(ii)(E).

The Purchase Agreement's indemnity provisions are contained in Article 9. With exceptions that are not implicated here, Section 9.5(a) provided: "The representations and warranties of the parties shall survive until the date that is twelve (12) months after the Closing Date at which point all of the representations and warranties set forth in this Agreement shall terminate[.]"

Section 9.7 provided in relevant part:

> Except for claims of specific performance of the terms of this Agreement pursuant to Section 11.3, or Actual Fraud and claims related to Section 1.2 of this Agreement, after the Closing the indemnification provision set forth in this Article 9 (and the rights to assert and recover for claims pursuant to the R&W Insurance Policy) will be the sole and exclusive remedy of the Parties with respect to any and all claims arising from or relating to this Agreement . . . whether arising in contract, tort, misrepresentation or otherwise."[55]

Relatedly, Section 9.6(f)(ii) provided in part: "nothing in this Article 9 shall limit . . . any Person's right to seek any remedy on account of Actual Fraud."

The Purchase Agreement defined "Actual Fraud" to mean: "actual common law fraud as determined under the laws of the State of Delaware regarding the terms and conditions of this Agreement."[56]

Section 9.8 contained a comprehensive non-reliance clause in which Plaintiff disclaimed reliance on any information not contained in Article 3 of the Purchase

---

[55] *Id.* § 9.7.

[56] *Id.* § 11.1(b)(i).

Agreement and the corresponding Disclosure Schedules.[57] And Section 11.11 contained a broad integration clause.[58]

## C. The Alleged Fraud

The fraud that Plaintiff complains of predominantly relates to the Company's purportedly improper pre-closing accounting practices. Plaintiff investigated the Company's pre-closing financials after the Company began missing its budget immediately after closing.[59] Two of the key alleged improprieties raised by Plaintiff are (1) the inflation of the Company's product margins, and (2) the improper capitalization and amortization of project costs.[60]

Regarding the inflated margins, Plaintiff alleges that several of the contracts that the Company was fulfilling were mispriced, causing the Company to lose money on them.[61] According to Plaintiff, prior to closing, the Company had an inaccurate accounting system that essentially hid costs that were associated with fulfilling contracts.[62] As an example, Plaintiff claims that no costs were recorded in the "Direct Labor at Standard" account until April 2021—around the same time Plaintiff

---

[57] *Id.* § 9.8.

[58] *Id.* § 11.11.

[59] Compl. ¶ 57.

[60] *Id.* ¶ 60.

[61] *Id.* ¶ 61.

[62] *Id.* ¶ 62.

sent its letter of intent to Seller.[63] When the Company—still controlled by Seller—first recorded Direct Labor costs in April 2021, it only recorded $53,402 of those costs.[64] When Plaintiff took over and implemented a new accounting system, "almost $2.6 million of costs were recorded to the Direct Labor account."[65]

As for the improper capitalization of costs, Plaintiff alleges that the Company had been treating operating expenses as project costs.[66] That allegedly incorrect categorization allowed the Company to amortize costs that should not have been amortized.[67] Plaintiff argues that the Company was not properly delineating between preproduction and production costs.[68] According to Plaintiff, only preproduction costs may be amortized under GAAP.[69] By improperly amortizing production costs, the Company was able to reduce its expenses and thereby inflate its EBITDA.[70] Plaintiff alleges, "had the Company correctly accounted for Project Costs, the Financial Statements would have shown [Plaintiff] that [the Company]'s EBITDA was approximately half of that represented by Seller."[71]

---

[63] *Id.* ¶¶ 47, 65.

[64] *Id.* ¶ 65.

[65] *Id.*

[66] *Id.* ¶ 67.

[67] *Id.* ¶ 69.

[68] *Id.*

[69] *Id.* ¶ 44.

[70] *Id.* ¶ 46.

[71] *Id.* ¶ 73.

Relatedly, Plaintiff alleges that the Company's pre-closing accounting practices and internal controls were insufficient.[72] The core of this allegation is that the Company's pre-closing management knew that the Company had serious accounting deficiencies and was not effectively "tracking costs, inventory and other criteria critical to maintaining accurate accounting and financial reports."[73] Plaintiff also alleges that the Company's accounting system had not been audited for compliance with applicable Federal Acquisition Regulation ("FAR") standards.[74]

Based on all of those alleged deficiencies, which Plaintiff argues were known to the Company's management prior to closing, Plaintiff claims the "Financial Statement Representations" in Section 3.4, as well as the "Government Contract Representations" in Section 3.10, were fraudulent.[75]

In addition to the accounting issues that comprise the bulk of Plaintiff's allegations, Plaintiff says the Top Customer representation in Section 3.14 was fraudulent.[76] Specifically, Seller disclosed "a change to the product pricing" in its contract with Axon, a Top Customer, but it allegedly failed to disclose the full extent of the expected changes to the Axon relationship.[77] Apparently, Axon told the

---

[72] *Id.* ¶¶ 76, 78, 80, 82.

[73] *Id.* ¶ 78.

[74] *Id.* ¶¶ 80, 82.

[75] *Id.* ¶¶ 74-82.

[76] *Id.* ¶¶ 83-84.

[77] *Id.* ¶ 84.

14

Company in February 2021 that it "was 'slashing [its] Q2 forecast, [would] only order about $450K in Q2, not be ordering any more [that] year, and [planned] on taking run rate down to $1M/yr going forward.'"[78] Plaintiff thus claims that Axon "threatened to" "significantly negatively modif[y] the volume or amount of . . . its business with the Company," in contrast with the representation in Section 3.14.[79]

## D. Procedural History

Plaintiff initiated this litigation by filing its Complaint on August 8, 2023.[80] The Complaint brings two Counts. Count I asserts fraud against Seller, Weissmann, Osborn, Bennignson, and Thomas (the "Fraud Defendants").[81] Count II asserts unjust enrichment against all of the Defendants.[82] Plaintiff seeks compensatory damages of a yet undetermined amount.[83]

Defendants, acting in unison, moved to dismiss Plaintiff's Complaint on October 16, 2023.[84] Plaintiff opposed Defendants' Motion on November 21, 2023.[85]

---

[78] *Id.* (alterations in original).

[79] *Id.* ¶ 83; Purchase Agreement § 3.14(a).

[80] Compl.

[81] *Id.* ¶¶ 113-24.

[82] *Id.* ¶¶ 125-29.

[83] Compl., Prayer for Relief ¶ D.

[84] D.I. No. 18 ("Defs.' Mot.").

[85] D.I. No. 24 ("Pl.'s Opp'n").

And Defendants replied on December 13, 2023.[86]  The Court heard argument on February 22, 2024.

### III.  STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(6), the Court (i) accepts all well-pled factual allegations as true, (ii) accepts even vague allegations as well-pled if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[87]  The Court will not, however, accept "conclusory allegations that lack specific supporting factual allegations."[88]

Motions to dismiss under Rule 12(b)(2) are evaluated under a different standard.  Under that Rule, "the plaintiff bears the burden of showing a basis for the trial court's exercise of jurisdiction over a nonresident defendant."[89]  At the pleading stage, the plaintiff need only "make a prima facie showing" that the Court has jurisdiction over the nonresident defendant.[90]  And the plaintiff is still entitled to have its well-pled allegations taken as true and have all reasonable inferences drawn

---

[86]  D.I. No. 27 ("Defs.' Reply").

[87]  *See ET Aggregator, LLC v. PFJE AssetCo Hldgs. LLC*, 2023 WL 8535181, at *6 (Del. Super. Ct. Dec. 8, 2023).

[88]  *Id.* (quoting *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[89]  *Taylor v. Killen*, 2023 WL 7490068, at *3 (Del. Super. Ct. Nov. 13, 2023) (citations omitted).

[90]  *Id.* (citations omitted).

in its favor.[91]  Unlike a Rule 12(b)(6) motion, however, the plaintiff's factual allegations can be "contradicted by affidavit," and the Court may look outside the Complaint to resolve the motion.[92]

## IV. PARTIES' CONTENTIONS

### A. Defendants

Defendants' Motion launches a volley of attacks at Plaintiff's Complaint.  It challenges this Court's jurisdiction over most of the Defendants, asserts that Plaintiff's action is untimely, and contends that neither Plaintiff's fraud nor unjust enrichment claims are adequately pled.

Beginning with its Rule 12(b)(2) argument, Defendants' Motion seeks dismissal of Weissmann, Osborn, Bennigson, Thomas, Osborn Generation Fund, CGP Holdings, Wood, Gezon, Wilkins, and Sierra Papa (the "Non-Delaware Defendants").[93]  That would leave only Seller, True West, and the tripartite Midwest Funds as defendants.  Defendants argue that the Non-Delaware Defendants can only be subjected to Delaware's jurisdiction via the Purchase Agreement's forum

---

[91]  *Id.*

[92]  *BACO Hldgs., Inc. v. Arria Data2Text, Ltd.*, 2023 WL 2199871, at *2 (Del. Super. Ct. Feb. 24, 2023) (citing *Green Am. Recycling v. Clean Earth, Inc.*, 2021 WL 2211696, at *3 (Del. Super. Ct. June 1, 2021)).

[93]  Defs.' Mot. at 6, 21.  Seller is not a Delaware entity but, as a signatory to the Purchase Agreement's forum selection clause, Seller does not contest this Court's jurisdiction over it.  *Id.* at 21.

selection clause if they are "closely related" to the Purchase Agreement.[94] Defendants conclude that the Non-Delaware Defendants are not closely related to the Purchase Agreement and so are not within this Court's jurisdiction.[95]

Defendants next contest the timeliness of the Complaint. They say the Purchase Agreement's representations' one-year survival period bar Plaintiff's claims.[96] According to Defendants, one year was enough time for Plaintiff to discover and allege any fraud contained in the Purchase Agreement.[97] Because Plaintiff did not do so within the survival period, Defendants say Plaintiff is now barred from doing so.[98]

Defendants also argue that Plaintiff failed to allege fraud with the requisite particularity under Rule 9(b).[99] Defendants relatedly assert that Plaintiff's fraud claim is belied by the truth of the Purchase Agreement's representations and the adequacy of the disclosures Seller made during due diligence.[100]

---

[94] *Id.* at 21-23.

[95] *Id.* at 23-26.

[96] *Id.* at 26-29.

[97] *Id.* at 29.

[98] *Id.*

[99] *Id.* at 29-37.

[100] *Id.* at 32-37.

Finally, Defendants say Plaintiff's unjust enrichment Count is untenable for several reasons.[101] For one, Defendants argue that since the unjust enrichment claim is based upon a deficient fraud claim, the absence of fraud precludes unjust enrichment.[102] Defendants next contend that the Purchase Agreement's exclusive remedy provision prohibits any quasi-contractual relief.[103] Defendants also say that Plaintiff cannot simultaneously bring fraud and unjust enrichment claims against the same entities because the fraud claim is a tacit admission that the Purchase Agreement governs their relationship.[104] Last, Defendants argue that the claims against Defendants who are not accused of fraud must be dismissed because those Defendants were too far removed from any alleged wrongdoing to be liable to Plaintiff.[105]

## B. Plaintiff

Plaintiff responds to each of Defendants' challenges. Starting with personal jurisdiction, Plaintiff acknowledges that its only jurisdictional hook over the Non-Delaware Defendants is equitable estoppel; but Plaintiff urges that the elements of that doctrine are met.[106] Plaintiff says that the Non-Delaware Defendants directly

---

[101] *Id.* at 37-49.

[102] *Id.* at 38-39.

[103] *Id.* at 39-42.

[104] *Id.* at 42-45.

[105] *Id.* at 45-49.

[106] Pl.'s Opp'n at 18-28.

benefitted from the Purchase Agreement by receiving portions of the consideration in the form of distributions.[107] Plaintiff continues that the Non-Delaware Defendants' involvement in putting the Purchase Agreement together made it foreseeable that they would be sued in Delaware.[108] Plaintiff suggests that either of those two theories suffices to bind the Non-Delaware Defendants to the Purchase Agreement's forum selection provision.[109] In a footnote, Plaintiff alternatively requests limited jurisdictional discovery.[110]

Plaintiff next defends the timeliness of its Complaint. Specifically, Plaintiff argues that under *ABRY Partners v. F&W Acquisition*[111] and its progeny, a fraudster cannot immunize itself from liability by relying on the terms of an agreement that was the product of fraud.[112] Plaintiff therefore claims that the Purchase Agreement's survival period for representations has no bearing on the time in which Plaintiff may bring fraud claims.[113] As a second argument, Plaintiff contends that since the Purchase Agreement's exclusive remedy provision carves out fraud claims, such

---

[107] *Id.* at 20-24.

[108] *Id.* at 26-28.

[109] *Id.*

[110] *Id.* at 26 n.13.

[111] 891 A.2d 1032 (Del. Ch. 2006).

[112] Pl.'s Opp'n at 28-31.

[113] *Id.*

claims are not limited by the Purchase Agreement's indemnity provisions, including the survival period.[114]

Plaintiff then delves into the merits of its Complaint, explaining how it pled the elements of fraud with the requisite particularity.[115] Plaintiff also challenges Defendants' attempts to factually disprove the alleged fraud, saying those arguments are procedurally improper and substantively incorrect.[116]

Plaintiff's opposition concludes with its defense of its unjust enrichment claim. Like Defendants, Plaintiff begins by reiterating its fraud-related arguments.[117] Plaintiff then argues that the Purchase Agreement's exclusive remedy provision does not bar the unjust enrichment Count because, here, unjust enrichment is functionally a remedy for fraud, which is an exception to the exclusive remedy provision.[118] Third, Plaintiff contends that it can bring both fraud and unjust enrichment claims against the same Defendants because Delaware courts allow unjust enrichment to be pled in the alternative.[119] Last, Plaintiff argues that its

---

[114] *Id.* at 31-33

[115] *Id.* at 33-40.

[116] *Id.* at 40-45.

[117] *Id.* at 46.

[118] *Id.* at 46-48.

[119] *Id.* at 48-50.

invocation of fraud enables it to assert unjust enrichment against entities that would be not be liable if the underlying wrongdoing were merely breach of contract.[120]

## V. ANALYSIS

### A. The Court Lacks Personal Jurisdiction over the Non-Delaware Defendants

Of the fifteen Defendants named in this suit, only four are at home in Delaware.[121] Plaintiff relies exclusively on the Purchase Agreement's forum selection provision to establish personal jurisdiction over the Non-Delaware Defendants.[122] Seller—the lone Defendant that signed the Purchase Agreement— acknowledges that it consented to this state's jurisdiction.[123] The rest of the Non-Delaware Defendants, however, argue that they cannot be made to litigate here because they are not bound to the Purchase Agreement.[124] They are correct.

A non-signatory can be bound to a contract's forum selection clause under the doctrine of equitable estoppel.[125] Whether that doctrine applies depends on three inquiries: "First, is the forum selection clause valid? Second, are the defendants third-party beneficiaries, or closely related to, the contract? Third, does the claim

---

[120] *Id.* at 50-52.

[121] Compl. ¶¶ 9-23. The four Delaware entities are True West and the three Midwest Funds. *See id.* ¶¶ 19-21, 23.

[122] Pl.'s Opp'n at 17-28.

[123] Defs.' Mot. at 21.

[124] *Id.* at 20-26.

[125] *CFGI, LLC v. Common C Hldgs. LP*, 2024 WL 325567, at *8 (Del. Super. Ct. Jan. 29, 2024).

arise from their standing relating to the . . . agreement?"[126] All three questions must be answered in the affirmative to bind the non-signatory to the forum selection provision.[127]

Here, the parties agree that the first and third prong are met. Their dispute lies in the second prong. Plaintiff acknowledges that the Non-Delaware Defendants are not third-party beneficiaries,[128] so the question is further narrowed to whether the Non-Delaware Defendants are "closely related" to the Purchase Agreement. An entity is closely related to a contract under Delaware law only if it "receives a direct benefit" from the contract or if "it was foreseeable" that the entity would be bound by the contract.[129] Plaintiff makes arguments under both alternatives, but neither convinces.

### 1. Direct Benefit

Plaintiff's primary basis for personal jurisdiction over the Non-Delaware Defendants is that they accepted a direct benefit from the Purchase Agreement.[130] Plaintiff contends that Seller received the purchase price and then distributed large

---

[126] *Sustainability Partners LLC v. Jacobs*, 2020 WL 3119034, at *5 (Del. Ch. June 11, 2020) (omission in original) (quoting *Cap. Grp. Cos. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 9, 2004)).

[127] *Id.*

[128] Pl.'s Opp'n at 18.

[129] *Sustainability Partners*, 2020 WL 3119034, at *6 (quoting *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019)).

[130] Pl.'s Opp'n at 20-26.

portions of those proceeds to its members.[131]  Plaintiff argues that those distributions were direct benefits of the Purchase Agreement that bind Seller's members to the Purchase Agreement and the forum selection clause therein.  The Court disagrees.

A direct benefit can be either pecuniary or non-pecuniary, but it cannot be indirect.[132]  Nor is the "mere contemplation" of a benefit is enough.[133]  A benefit that depends upon the discretionary acts of others in order to be realized is indirect.[134]  Similarly, a benefit that "would only materialize through a separate agreement" is indirect.[135]  In contradiction of those principles, Plaintiff rests its argument on a benefit that depended on Seller's managers separately agreeing to distribute the proceeds of the Purchase Agreement.

The Court is guided by the result in *CLP Toxicology*.  There, certain defendants were equity owners of the seller in a purportedly fraudulent transaction.[136]  The plaintiff alleged that after the fraudulent sale, the seller distributed all of the proceeds in an effort to hinder the plaintiff's ability to recover

---

[131]  *Id.* at 20.

[132]  *Neurvana Med.*, 2019 WL 4464268, at *4.

[133]  *Id.* (internal quotation marks omitted).

[134]  *See CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *13 n.100 (Del. Ch. June 29, 2020); *Cf. Weygandt v. Weco, LLC*, 2009 WL 1351808, at *5 (Del. Ch. May 14, 2009) (holding a non-signatory lessor was bound to an asset purchase agreement's jurisdictional consent provision via equitable estoppel because the asset purchase agreement expressly required the buyer to sign a lease with that lessor).

[135]  *Neurvana Med.*, 2019 WL 4464268, at *4.

[136]  *CLP Toxicology*, 2020 WL 3564622, at *1, 15.

in litigation.[137]  The plaintiff raised a variety of theories to establish personal jurisdiction over the defendants, one of which was equitable estoppel based on a direct benefit.[138]  None of those arguments succeeded with regard to the "Non-Delaware Defendants."[139]  As for equitable estoppel, the court concluded, "any benefits these non-Delaware Defendants received were indirect because they depended upon the acts of the managers of the respective entities to further distribute funds from the sale."[140]  So too here.

Plaintiff tries to distinguish *CLP Toxicology* by pointing out that, here, Seller's managers specifically agreed to the distributions related to the Purchase Agreement as part of their pre-closing approval of the Purchase Agreement.[141]  Plaintiff argues that those predetermined distributions were more closely tied to the Purchase Agreement than the post-closing distributions in *CLP Toxicology*.[142]  Plaintiff's argument remains unavailing.

Most basically, Plaintiff's theory eschews the core requirement of a direct benefit—*i.e.*, that it is direct.  The Purchase Agreement's consideration was paid only to Seller.  The benefits realized by the other Defendants necessarily had to pass

---

[137]  *Id.* at \*7.

[138]  *Id.* at \*8, 13.

[139]  *Id.* at \*13-16.

[140]  *Id.* at \*13 n.100.

[141]  *See* Pl.'s Opp'n, Ex. 2.

[142]  Pl.'s Opp'n at 26.

through Seller, subject to Seller's discretion, in order to reach the rest of the Defendants. Stated differently, the Non-Delaware Defendants did not benefit from the Purchase Agreement itself, they benefitted from the related distribution decision. The indirectness of the benefit is even more stark with regard to the Defendants who only had an interest in one of Seller's members, and whose alleged benefits therefore had to be distributed twice before reaching them.[143]

The timing of Seller's approval of the distribution—shortly before the Purchase Agreement was signed—might intuitively make the Non-Delaware Defendants' benefits seem more direct. But it is not the timing of Seller's approval of the distribution that matters; it is the underlying fact that the Non-Delaware Defendants' benefits were contingent on Seller's discretion in the first instance that makes them indirect.[144]

Moreover, haling the Non-Delaware Defendants into Delaware's courts based solely on distributions they received as members of an entity that signed a forum selection clause raises special concerns. The foundation of equitable estoppel is that a person who chooses to accept the benefits of a contract must also accept its

---

[143] These Defendants are Weissmann, Osborn, Gezon, Wood, and Wilkins, who only had an interest in separate entities that were members of Seller.

[144] The Court agrees with Plaintiff that the Non-Delaware Defendants received more than the "mere contemplation of benefits." *See* Pl.'s Opp'n at 26. But that only means they received an actual benefit, not a direct one.

burdens.[145]  But, in the context of a signatory entity's members, passive members could theoretically receive distributions derived from a contract without even knowing about, let alone embracing, that contract.  In that case, if the Court accepted Plaintiff's position that distributions are a direct benefit, members of the signatory could be bound to a forum selection provision without having taken any action with respect to the relevant contract.  The Court cannot abide a result so clearly in tension with the due process concerns associated with personal jurisdiction.[146]

The Court is cognizant that, for the most part, the Non-Delaware Defendants are not alleged to have been mere passive investors unfamiliar with the Purchase Agreement.  But the direct benefit analysis is a discrete inquiry.  The Court will not diverge from the established "closely related" test by cobbling together an indirect benefit with alleged knowledge of the contract to fashion a novel path to personal jurisdiction in this state.[147]  Hence, Plaintiff's argument under the direct benefit prong fails.

---

[145] *Neurvana Med.*, 2019 WL 4464268, at *3 ("Equitable estoppel exists 'to prevent someone from accepting the benefits of a contract without accepting its obligations.'" (quoting *Plaze, Inc. v. Callas*, 2019 WL 1028110, at *8 (Del. Ch. Feb. 28, 2019))).

[146] *See Genuine Parts Co. v. Cepec*, 137 A.3d 123, 127 n.12 (Del. 2016) ("[T]he Due Process Clause . . . gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." (omission in original) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980))).

[147] The Court of Chancery has explained how expanding the foreseeability prong of the "closely related" test imperils important principles of corporate separateness.  *See Neurvana Med.*, 2019 WL 4464268, at *6.  The same concern is present here.  Adopting Plaintiff's argument would effectively require the Court to look past Seller's existence as a distinct entity and view the Non-

## 2. Foreseeability

Although foreseeability is an independent basis for an entity to be "closely related" to a contract, it often takes a "subordinate role" in this analysis.[148] "Foreseeability" is also something of a misnomer here. As opposed to the broad, fact-intensive assessment that typically accompanies foreseeability analyses in other legal settings, only two specific scenarios suffice in this context. The first is where a non-signatory defendant seeks to enforce a forum selection provision against a signatory plaintiff.[149] The second is where a non-signatory is controlled by a signatory and the non-signatory "bears a 'clear and significant connection to the subject matter of the agreement.'"[150] Delaware courts have declined to expand this "narrowly constrained" doctrine any further than that.[151]

---

Delaware Defendants as personally negotiating the Purchase Agreement for their own benefit. This Court does not favor such arguments. *See Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *7 (Del. Super. Ct. Jan. 13, 2021) ("Delaware courts do not lightly . . . disregard entity separateness. Rather, they expect that counterparties will do so bilaterally if they wish." (citations omitted)).

[148] *See Neurvana Med.*, 2019 WL 4464268, at *5.

[149] *Sustainability Partners*, 2020 WL 3119034, at *7 (first citing *Ashall Homes Ltd. v. ROK Entm't Grp., Inc.*, 992 A.2d 1239, 1249 (Del. Ch. 2010); and then citing *Lexington Servs. Ltd. v. U.S. Patent No. 8019807 Delegate, LLC*, 2018 WL 5310261, at *5-6 (Del. Ch. Oct. 26, 2018)).

[150] *Id.* (quoting *iModules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *3 (Del. Ch. Dec. 22, 2017)).

[151] *See id.* ("[T]he foreseeability analysis is best narrowly constrained to these two contexts; expanded too far, it 'requires rejecting principles of corporate separateness' by broadly haling into Delaware courts those who neither joined an agreement nor received any benefit from it." (quoting *Nuervana Med.*, 2019 WL 4464268, at *6)).

Plaintiff does not confine its foreseeability analysis to those recognized contexts—indeed, Plaintiff makes no mention of them. Instead, Plaintiff reiterates its direct benefit argument and claims those distributions made it foreseeable that the Non-Delaware Defendants would be bound to the Purchase Agreement.[152] Plaintiff adds that certain Non-Delaware Defendants were integrally involved in the negotiation and approval of the Purchase Agreement.[153] Neither of those arguments is a viable avenue for establishing the foreseeability prong. Accordingly, equitable estoppel does not apply in this case, so the Court lacks personal jurisdiction over the Non-Delaware Defendants.

### 3. There is No Basis for Jurisdictional Discovery

In a one-sentence footnote, Plaintiff requested jurisdictional discovery in the event the Court did not agree with Plaintiff's personal jurisdiction argument as it pertains to Weissmann, Osborn, Wood, Gezon, and Wilkins—*i.e.*, the Defendants who are not members of Seller.[154] To obtain jurisdictional discovery, a plaintiff must

---

[152] Pl.'s Opp'n at 26-28.

[153] *Id.* This type of argument has been labelled the "active-involvement theory" and has been expressly rejected as a jurisdictionally significant connection to a forum selection clause. *Sustainability Partners*, 2020 WL 3119034, at *7 (citing *Nuervana Med.*, 2019 WL 4464268, at *7-8); *see also Partners & Simons, Inc. v. Sandbox Acquisitions, LLC*, 2021 WL 3161651, at *8 (Del. Ch. July 26, 2021) (ORDER).

[154] Pl.'s Opp'n at 26 n.13.

articulate a good-faith reason for it that is neither futile nor the launch of a "dragnet 'fishing expedition.'"[155]  No such reason is present here.

Plaintiff did not indicate what discovery it seeks to obtain or how such discovery would aid its jurisdictional argument.  Based on context, the Court infers that Plaintiff hopes to prove these five Defendants eventually received a portion of the Purchase Agreement's consideration through their respective affiliated entities.  But, as explained above, even the affiliated entities—which are members of Seller— were not directly benefitted by the Purchase Agreement.  That being so, and without further elucidation from Plaintiff, the Court views Plaintiff's request for jurisdictional discovery as futile.

## B.  Plaintiff's Claims are Timely

Along with the personal jurisdiction question answered above, another threshold issue in this case is the timeliness of Plaintiff's claims.  Plaintiff's Complaint, which was filed in August 2023, falls within the three-year statute of limitations that ordinarily applies to claims of fraud and unjust enrichment.[156]  But the Purchase Agreement's at-issue representations were subject to a one-year survival period.[157]  As a general matter, survival periods operate to contractually

---

[155] *See Green Am. Recycling*, 2021 WL 2211696, at *8 (quoting *CLP Toxicology*, 2020 WL 3564622, at *15).

[156] *See* 10 *Del. C.* § 8106(a).

[157] Purchase Agreement § 9.5.

shorten the applicable statute of limitations.[158] In reliance on that general rule, Defendants argue that Plaintiff's claims came too late under the Purchase Agreement and are thus barred.[159] The analysis is not so simple, however.

"Delaware courts have [a] distaste for immunizing fraud."[160] As a result, one of the rare instances in which a Delaware court will override the plain language of a contract is where doing so is necessary to properly redress intentional fraud.[161] That raises the question of whether contractually imposed limits on the time a party has to bring fraud claims are enforceable.

It appeared that question was answered in *Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC*.[162] There, an aggrieved party's fraud claim was putatively time-barred by two contractual time limitations—one sixty days, the other six months—which applied to different components of the parties' agreement.[163] In a succinct analysis, this Court distinguished the seminal case in this field, *ABRY Partners*, by saying the at-issue contract provided "a reasonable period of

---

[158] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *3 (Del. Ch. July 11, 2011).

[159] Defs.' Mot. at 26-29.

[160] *ABRY Partners*, 891 A.2d at 1061.

[161] *Id.* at 1059-64; *see also Surf's Up*, 2021 WL 117036, at *11 n.143 (collecting cases in which "Delaware courts refuse[d] to enforce contracts purporting to condone—or at least insulate—intentional fraud").

[162] 2008 WL 2582920, at *5 (Del. Super. Ct. Mar. 28, 2008).

[163] *Id.* at *5 n.30.

opportunity to unearth possible misrepresentations."[164] For that reason, this Court enforced the contractual time limitation despite the fraud allegations.[165] According to Defendants, that ends the inquiry because the one-year survival period here is reasonable.[166]

*Sterling Network*, however, does not have a sterling reputation as precedent. Instead, the only Delaware case that has previously discussed *Sterling Network* in any significant detail explicitly and sharply called into doubt *Sterling Network*'s analysis of *ABRY Partners*.[167] The details of Vice Chancellor Slight's forceful critique of *Sterling Network* in *Online HealthNow* need not be recited here. For present purposes, it is enough to note his conclusion that "the basis for *Sterling*'s rationale is questionable, and reflexive application of a 'reasonableness' standard to survival clauses in the context of contractual fraud is likely not warranted."[168]

---

[164] *Id.* at *5.

[165] *Id.*

[166] Defs.' Mot. at 28-29.

[167] *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *15-16 (Del. Ch. Aug. 12, 2021). *Sterling Network* has been cited in other cases for the standard applicable to a motion to dismiss and as an example of a contractual time limitation in cases that did not reference its analysis of *ABRY Partners*. *See Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *8 (Del. Super. Ct. Aug. 17, 2020); *AssuredPartners of Va., LLC v. Sheehan*, 2020 WL 2789706, at *14 (Del. Super. Ct. May 29, 2020); *ENI Hldgs., LLC v. KBR Grp. Hldgs., LLC*, 2013 WL 6186326, at *4 (Del. Ch. Nov. 27, 2013); *GRT, Inc.*, 2011 WL 2682898, at *3; *Janeve Co., Inc. v. City of Wilmington*, 2009 WL 1482230, at *1 (Del. Super. Ct. May 7, 2009).

[168] *Online HealthNow*, 2021 WL 3557857, at *16.

Despite Vice Chancellor Slight's misgivings about *Sterling Network* and his indication that survival clauses do not apply to claims of intentional fraud, he did not have occasion to conclusively reject *Sterling Network*. Instead, the Vice Chancellor relied on factual distinctions to hold that even if a reasonableness test applied to survival clauses in fraud cases, the fraud claim in *Online HealthNow* was not time-barred.[169] That leaves *Sterling Network*'s holding endangered, but not quite extinct.

This opinion will neither reinvigorate *Sterling Network* nor put the final nail in its coffin. That is because before looking to public policy to decide whether the Purchase Agreement's survival clause applies to fraud claims, the Court must start with ordinary principles of contract interpretation.[170] In this regard, the Court is guided by *ENI Holdings*.[171] There, like here, the relevant survival period was contained in the contract's indemnity provisions, and the indemnity provisions were slated to be the exclusive remedy available to the parties.[172] But, also like this case,

---

[169] *Id.* at *17-18.

[170] *See, e.g.*, *ABRY Partners*, 891 A.2d at 1051-55 (determining the plain language of the at-issue Stock Purchase Agreement limited the plaintiff's fraud remedies before applying public policy).

[171] 2013 WL 6186326, at *15-16.

[172] *Id.* at *15.

the exclusive remedy provision in *ENI Holdings* explicitly "carve[d] out fraud from the strictures of the indemnification-remedy provision."[173]

Faced with that combination of clauses, Vice Chancellor Glasscock opined: "The SPA, by providing that the indemnification provisions do not constitute the 'sole and exclusive remedy' for fraud, contemplates that at least some actions grounded in fraud can be brought outside the SPA's indemnification provisions, and thus, can be timely brought within the statutory—rather than contractual—limitations period."[174] He continued that the absence of an explicit fraud exclusion from the survival clause itself created "at best" an ambiguity that could not result in dismissal.[175] That reasoning has been followed in other cases,[176] and the Court is persuaded to do the same here.

In an attempt to circumvent that precedent, Defendants argue that the Purchase Agreement's exclusive remedy provision only carved out fraud claims "related to Section 1.2" of the Purchase Agreement.[177] That interpretation is unreasonable. The relevant carve-out in Section 9.7 reads: "Except for claims of specific performance

---

[173] *Id.* at *16; Purchase Agreement § 9.7 ("Except for claims of . . . Actual Fraud . . . the indemnification provision set forth in this Article 9 . . . will be the sole and exclusive remedy of the Parties with respect to any and all claims arising from or relating to this Agreement . . . .").

[174] *ENI Hldgs.*, 2013 WL 6186326, at *16.

[175] *Id.*

[176] *See Spay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at *7 (Del. Ch. Dec. 21, 2021); *In re Swervepay Acquisition, LLC*, 2022 WL 3701723, at *25 (Del. Ch. Aug. 26, 2022).

[177] Defs.' Reply at 19-20 (citing Purchase Agreement § 9.7).

of the terms of this Agreement pursuant to Section 11.3, or Actual Fraud and claims related to Section 1.2 of this Agreement . . . ."[178] Defendants rely on an esoteric interplay of grammar and formal logic to aver that the "or" which precedes "Actual Fraud" is disjunctive while the "and" that follows "Actual Fraud" is conjunctive.[179] Such a nuanced approach is not necessary in this instance.

If Defendants' construction of Section 9.7 were correct, the term "Actual Fraud" would be a pointless appendage in an otherwise meticulously crafted clause. That is so because "claims related to Section 1.2" necessarily encompasses fraud claims related to Section 1.2. Delaware courts are disinclined to find that parties included meaningless language in a contract, especially when that contract was carefully drafted by sophisticated parties.[180] Were there any doubt about the scope of Section 9.7's fraud exception, Section 9.6(f)(ii) settles the matter by stating, "nothing in this Article 9 shall limit . . . any Person's right to seek any remedy on

---

[178] Purchase Agreement § 9.7.

[179] Defs.' Reply at 19-20 (citing *Weinberg v. Waystar, Inc.*, 2022 WL 2452141, at *3-4 (Del. Ch. July 6, 2022), *aff'd*, 294 A.3d 1039 (Del. 2023)).

[180] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023) (explaining that courts interpreting contracts "endeavor 'to give each provision and term effect' and not render any terms 'meaningless or illusory'" (quoting *Manti Hldgs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))); *see also NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court." (citing *Majkowski v. Am. Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del. Ch. 2006))).

account of Actual Fraud."[181]  Section 9.6(f)(ii) makes no mention of Section 1.2 or any other qualifier.  Accordingly, Section 9.5's survival clause and Section 9.7's exclusive remedy provision do not limit Plaintiff's ability to seek a remedy on account of fraud, so Plaintiff's claims are timely.[182]

## C. Plaintiff's Fraud Allegations are Reasonably Conceivable

With that, the Court can focus on the merits.  A common law fraud claim consists of five elements: (1) a false representation; (2) the defendant's knowledge of the representation's falsity or reckless indifference to its truth; (3) the defendant's intent to induce action or inaction by the plaintiff; (4) the plaintiff's justifiable reliance on the false representation; and (5) the plaintiff being damaged by such reliance.[183]  Additionally, Rule 9(b) requires "the circumstances of the fraud" to be pled with particularity.[184]

Defendants sort Plaintiff's fraud allegations into three categories and contest each one: (1) the Company's treatment of Project Costs; (2) the Company's internal accounting systems; and (3) the Company's Top Customer disclosures.[185]

---

[181]  Purchase Agreement § 9.6(f)(ii).

[182]  The exclusive remedy provision's effect on Plaintiff's unjust enrichment claim is addressed below.  *See infra* Section V.D.1.

[183]  *See ABRY Partners*, 891 A.2d at 1050 (citing *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005)).

[184]  *Id.*

[185]  Defs.' Mot. at 32.

Defendants' arguments take the form of factual challenges to the Complaint and are therefore unavailing at this stage. Specifically, Defendants say the Purchase Agreement's representations were true and, to the extent they were not, Seller made adequate disclosures in due diligence. The Court will briefly summarize the arguments, but the upshot is that discovery is warranted before these disputes are resolved.

Regarding the Project Costs, Defendants contend that Plaintiff had access to a "Quality of Earnings Report" that adequately disclosed the Company's pre-closing capitalization practices.[186] Plaintiff responds that the Quality of Earnings Report only disclosed capitalization of "pre-production" costs, while Plaintiff's allegations pertain to the capitalization of "production" costs, which are treated differently under GAAP.[187] Plaintiff reiterates that the Company allegedly designed its accounting practices "to alter its financials in ways that were not easily detected by auditors or purchasers and are not readily discernable through reasonable due diligence."[188] The extent to which Plaintiff reasonably could have uncovered the Company's treatment of production costs based on the Quality of Earnings Report is a fact question for another time.

---

[186] *Id.* at 32-34.

[187] Pl.'s Opp'n at 41.

[188] *Id.* (quoting Compl. ¶ 37).

The conclusion is the same regarding the adequacy of the Company's internal accounting systems. Defendants argue, in essence, that nothing was inherently wrong with the Company's pre-closing accounting system and that Plaintiff merely "disagrees" with the Company's practices.[189] Plaintiff retorts that Seller knew that the Company's accounting mechanisms were below the standard represented in the Purchase Agreement.[190] Again, this is a quintessential factual dispute that will not be resolved in a factual vacuum.

The same is true with respect to the Top Customer disclosure. Defendants say that they adequately disclosed adverse changes to the Axon relationship.[191] Plaintiff says the relevant disclosure only pertained to price changes, not a broad reduction in Axon's business.[192] Resolution of this dispute turns on questions of fact, not law, and therefore would be premature at this point in the litigation.

Relatedly, Defendants overemphasize the burden imposed by Rule 9(b) when the fraud claim is based on a written contract.[193] To satisfy Rule 9(b), a plaintiff need only specifically allege "(1) the time, place, and contents of the false

---

[189] Defs.' Mot. at 35-36.

[190] Pl.'s Opp'n at 42-43.

[191] Defs.' Mot. at 36-37.

[192] Pl.'s Mot. at 43-44.

[193] *See Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015) ("When a party sues based on a written representation in a contract . . . it is relatively easy to plead a particularized claim of fraud.").

representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[194] Here, Seller allegedly made the false representations in the Purchase Agreement to obtain an unduly favorable purchase price. That satisfies Rule 9(b). In sum, Plaintiff's Complaint is enough to put Defendants on notice of a reasonably conceivable claim of fraud, so it survives dismissal under Rule 12(b)(6).

## D. Adequacy of Plaintiff's Unjust Enrichment Allegations

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[195] To plead unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, [and] (4) the absence of justification."[196] If the parties' relationship is "comprehensively governed by contract" an unjust

---

[194] *ABRY Partners*, 891 A.2d at 1050 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129,145 (Del. Ch. 2003)).

[195] *CFGI*, 2024 WL 325567, at *6 (internal quotation marks omitted) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).

[196] *Id.* (quoting *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 875 (Del. 2020)). The Delaware Supreme Court recently clarified that while "absence of a remedy provided by law" has traditionally been enumerated as an element of unjust enrichment, that element is only required to obtain the Court of Chancery's equitable jurisdiction. *State ex. rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390-91 (Del. 2023) (citing *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022)).

enrichment claim will be dismissed, unless the enforceability of the contract is in doubt.[197]

For their arguments regarding a lack of justification, the parties rely on their respective fraud-related arguments to either defeat or establish that element. As explained above, Plaintiff's fraud claim is tenable at this stage. The Court need not repeat that discussion and will, instead, focus on the parties' other contentions.

### 1. The Exclusive Remedy Provision does not Bar Plaintiff's Unjust Enrichment Claim

Defendants contend that the Purchase Agreement's exclusive remedy provision bars Plaintiff's unjust enrichment claim. Defendants first argue that fraud-based claims are only excluded from the exclusive remedy provision if they relate to Section 1.2 of the Purchase Agreement.[198] As explained above, that position is incorrect.[199] Defendants raise a different theory in their Reply Brief, but it is no more availing.

Defendants claim that if the unjust enrichment claim is only a remedy for the fraud claim, it cannot be pled as a separate Count.[200] In support, Defendants cite *Quadrant Structured Products Co., Ltd. v. Vertin*[201] and *iBio, Inc. v. Fraunhofer USA,*

---

[197] *CFGI*, 2024 WL 325567, at *6 (citations omitted).

[198] Defs.' Mot. at 40.

[199] *See supra* Section V.B.

[200] Defs.' Reply at 24-25.

[201] 102 A.3d 155 (Del. Ch. 2014).

*Inc.*,[202] where the Court of Chancery dismissed counts that sought specific remedies for alleged misconduct—such as requests for injunctive relief, establishment of a constructive trust, and partial recission. The court dismissed those counts "[a]s a technical matter," but acknowledged the plaintiff could still obtain the requested relief.[203] Defendants also cite cases where the Court of Chancery dismissed "redundant" claims.[204]

Those cases are inapposite here. Plaintiff's unjust enrichment claim, though linked to its fraud claim, is neither duplicative nor superfluous. Count II of the Complaint seeks relief on a theory that is legally distinct from, albeit related to, the fraud claim. For that reason, Plaintiff's unjust enrichment claim is unlike the toothless claims that were dismissed in the cases Defendants rely upon.

The remaining question is whether the fact that unjust enrichment is not a "remedy" for fraud in the procedural sense—*i.e.*, not simply a form of relief like a constructive trust or an injunction—means that unjust enrichment is not encompassed in Section 9.7's fraud exception. Section 9.7, which provides for exclusive remedies, carves out "claims of . . . Actual Fraud."[205] Section 9.6(f)(ii)

---

[202] 2020 WL 5745541 (Del. Ch. Sept. 25, 2020).

[203] *See id.* at *12; *Quadrant*, 102 A.3d at 203.

[204] Defs.' Reply at 25 (first citing *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013); and then citing *Metro. Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *18 (Del. Ch. Dec. 20, 2012)).

[205] Purchase Agreement § 9.7.

effectively adds to that exclusion by providing, "nothing in this Article 9 shall limit . . . any Person's right to seek *any remedy on account of Actual Fraud*."[206]  Here, Plaintiff's unjust enrichment claim seeks a remedy "on account of" fraud and is therefore not barred by Section 9.7.

Merriam-Webster[207] defines the phrase "on account of" to mean "because of."[208]  In this instance, the unjust enrichment claim only exists "because of" the alleged fraud.  Stated differently, Defendants' enrichment was allegedly unjust because it was procured by fraud.  The parties to the Purchase Agreement chose not to limit the ability to seek "any remedy on account of Actual Fraud."  That being so, the Court will not defeat the parties' expressed intent by limiting the remedies Plaintiff can seek in response to Defendants' alleged fraud.

## 2.  Unjust Enrichment Against Seller

Defendants argue that Plaintiff cannot maintain an unjust enrichment claim against Seller[209] because the Purchase Agreement governs and preempts any quasi-

---

[206]  Purchase Agreement § 9.6(f)(ii) (emphasis added).

[207]  "Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Chordia v. Lee*, 2024 WL 49850, at *25 n.287 (Del. Ch. Jan. 4, 2024) (quoting *Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC*, 2023 WL 2771509, at *17 (Del. Ch. Apr. 4, 2023)).

[208]  *Account*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/account (last visited Apr. 10, 2024).

[209]  This argument originally pertained to each Defendant against whom Plaintiff pled fraud—*i.e.*, Seller, Weissmann, Osborn, Bennigson, and Thomas.  But since Weissmann, Osborn, Bennigson, and Thomas are without this Court's jurisdiction, there is no need to analyze this issue as to them.

contractual claims.[210] Though that is the general rule,[211] an exception applies in this instance.

As stated in *Kuroda*, "A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."[212] Stated differently, "if 'the contract is the measure of [the plaintiff's] right, there can be no recovery under an unjust enrichment theory independent of it.'"[213] But, "[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as . . . fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract."[214]

In *LVI Group*, the defendants enriched themselves through a contract that was allegedly obtained through their fraud.[215] Although a contract seemed to govern the parties' relationship, the Court of Chancery nevertheless permitted an unjust enrichment claim.[216] The Court reasoned, "because the Complaint adequately

---

[210] Defs.' Mot. at 42-44.

[211] *See River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at \*6 (Del. Super Ct. Feb. 4, 2021); *Kuroda v. SPSJ Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[212] *Kuroda*, 971 A.2d at 891.

[213] *Id.* (quoting *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979)).

[214] *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at \*16 (Del. Ch. Mar. 28, 2018) (alterations in original) (citations omitted).

[215] *Id.* at \*17.

[216] *Id.*

alleges that the Contribution Agreement itself arose from the Defendants' fraud, the existence of that contract does not bar the unjust enrichment claim."[217]  Delaware courts have consistently applied this principle.[218]  It applies again here.

Plaintiff adequately alleges that the Purchase Agreement itself arose from Seller's fraud.  It follows that the Purchase Agreement does not comprise "the measure of [the] plaintiff's right."[219]  Plaintiff can thus maintain its unjust enrichment claim along with the fraud claim and, if it prevails on both, "plaintiff then will have to elect [its] remedies."[220]

### 3.  Unjust Enrichment Against the Non-Fraud Defendants

Defendants also claim that Midwest Mezzanine, Fund V Blocker, Fund V Intermediate, and True West (together, the "Non-Fraud Defendants")[221] are immune to Plaintiff's unjust enrichment claim because their enrichment is insufficiently related to Plaintiff's impoverishment.[222]  That is correct.

---

[217]  *Id.*

[218]  *See, e.g.*, *Adviser Invs., LLC v. Powell*, 2023 WL 6383242, at *8 (Del. Ch. Sept. 29, 2023); *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *28 (Del. Ch. Aug. 13, 2014); *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. Aug. 29, 2008).

[219]  *LVI Grp. Invs.*, 2018 WL 1559936, at *16.

[220]  *McPadden*, 964 A.2d at 1276.

[221]  Again, this argument initially applied to several Defendants without this Court's jurisdiction. To avoid confusion, the Court limits its analysis to only those Defendants as to whom the issue is not moot.  *See supra* note 209.

[222]  Defs.' Mot. at 45-48.

"The general rule is that the plaintiff must show that there is some direct relationship between a defendant's enrichment and a plaintiff's impoverishment. In other words, there must be a showing that the defendant was enriched unjustly by the plaintiff *who acted for the defendant's benefit*."[223] A "simple relationship between the plaintiff's impoverishment and defendants' enrichment" is only enough where "a nonparty to a contract knowingly facilitates prohibited activities."[224]

Plaintiff does not allege that the Non-Fraud Defendants knowingly facilitated the alleged fraud. Hence, the more stringent standard applies, and Plaintiff must show that it acted for the Non-Fraud Defendants' benefit.[225] Plaintiff does not do so. Instead, as in *CoreTel*, Plaintiff simply "alleges [Defendants] should not be allowed to keep the proceeds from the [fraudulent] sale."[226] That is not enough to support an unjust enrichment claim.[227]

Plaintiff makes no attempt to distinguish *CoreTel* or *Wind Energy*. Nor does Plaintiff seek to satisfy the test recited therein. Instead, Plaintiff focuses solely on

---

[223] *CoreTel Am., Inc. v. Oak Point Partners, LLC*, 2022 WL 2903104, at *11 (Del. Super. Ct. July 21, 2022) (emphasis added) (cleaned up) (quoting *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59-60 (Del. Ch. 2012)).

[224] *Id.* (quoting *Lyons Ins. Agency v. Kirtley*, 2019 WL 1244605, at *3 (Del. Super. Ct. Mar. 18, 2019)); *see also Stein v. Wind Energy Hldgs., Inc.*, 2022 WL 17590862, at *9 (Del. Super. Ct. Dec. 13, 2022).

[225] *See CoreTel Am.*, 2022 WL 2903104, at *11.

[226] *Id.* *12.

[227] *Id.*

the fact that a contract procured by fraud does not stand in the way of an unjust enrichment claim.[228] Be that as it may, Plaintiff has still failed to plead an adequate connection between its impoverishment and the Non-Fraud Defendants' enrichment. Accordingly, Count II is dismissed as to the Non-Fraud Defendants.

## VI. CONCLUSION

This Court lacks personal jurisdiction over each Defendant except for Seller, True West, Midwest Mezzanine, Fund V Blocker, and Fund V Intermediate. The lone claim against True West, Midwest Mezzanine, Fund V Blocker, and Fund V Intermediate is deficient. Accordingly, all of Plaintiff's claims, except those against Seller, are dismissed. Therefore, Defendant's Motion to Dismiss is **GRANTED in part, DENIED in part**.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[228] Pl.'s Opp'n at 50-52.